No. 85,953

IN THE MATTER OF THE APPEAL OF THE CITY OF WICHITA FROM
AN ORDER OF THE DIVISION OF TAXATION ON AN ASSESSMENT
OF SALES TAX, PENALTY, and INTEREST.

(59 P.3d 336)

Opinion filed December 6, 2002.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Gary Rebenstorf* and *Brian K. McLeod*, of Wichita, were with him on the briefs for appellant.

*Richard L. Cram*, of the Kansas Department of Revenue, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: The controversy between the City of Wichita (City) and the Kansas Department of Revenue (Department) involving a retailers sales tax assessment for electricity consumed by the City in its delivery of water comes before this court upon our grant of the Department's petition for review. The Court of Appeals reversed the Board of Tax Appeals' (BOTA) decision that additional retailers sales tax upon the electricity was due on the basis that to do otherwise denied the City equal protection under the United States Constitution. We review that decision, which, if erroneous, requires us to determine the applicable law as well as the intent of the legislature with regard to the retailers sales tax.

The City is a political subdivision owning and operating a water treatment plant. The treatment plant provides water for the dual purpose of fire protection and furnishing water to others. The Department conducted an audit of the City's electricity purchases used to power the water treatment plant for the period of June 1,

1992, through May 31, 1995. Although requested to do so, the Department declined to segregate the electricity purchases according to the percentage of the water used for governmental purposes and the percentage of the water sold to consumers.

The electricity purchased during the audit period was used to pressurize water at the Hess Pump Station which is part of the Sim Park Water Works Complex located approximately 1,000 feet from the water treatment plant. The City's water system is an integrated system; the treatment plant and water distribution system are controlled from a central location. The Hess Pump Station is operated from a control room in the water treatment plant. The plant operator must take into account the City's demand for water, the amount of chemicals needed to treat the water, and the amount of pressure necessary to deliver the water, in addition to all other needs in order to deliver potable water to others.

City water is pressurized at the Hess Pump Station and pushed into the City's distribution system. The Environmental Protection Agency (EPA) and the Kansas Department of Health and Environment (KDHE) regulations require that the water be treated and pressurized at a minimum of 20 PSI (pounds per square inch) throughout the distribution process in order to be considered potable. In addition to pushing water through the distribution system and meeting KDHE regulations, pressurization also ensures proper volume for fire protection and prevents backflow contamination in the water distribution system. Pressurization is important to water quality because backflow presents a serious health hazard. The water's potability is first measured at the discharge side of the Hess Pump Station. This is just past the pump station, after pressure has been added and electricity has been consumed.

Max Smith, a Department auditor, was originally appointed to conduct the City's audit in September 1994. However, before he could complete the audit, Smith unexpectedly retired because of medical problems. In February 1995 the audit was assigned to Laurie Blaha, another Department auditor. Blaha began the audit in July 1995 and completed the audit within 6 months, which according to Robert Lewis, the audit manager for the Department, is typical for audits as involved as the City's. According to Blaha,

other assignments kept her from beginning the City's audit until July 1995.

Blaha testified that she worked diligently on completing the audit. During the hearing before the administrative law judge (ALJ), the City's counsel admitted that "the six months from late July to early February, '96 is not an unreasonable time for this audit given its complexity."

The Department's audit for the period beginning June 1, 1992, and ending May 31, 1995, determined that the City owed $337,623 plus interest of $110,031 as additional sales tax for electricity used to pressurize and treat the water, which was assessed at a rate of 4.9%. The City appealed and on February 11, 1999, the ALJ issued a final determination upholding the tax assessment rate of 4.9% together with interest.

The City appealed the Department's tax assessment to BOTA on February 22, 1999. The City sent a letter to BOTA on March 1, 1999, asking BOTA to issue a quick decision so the City could join the appeal in *In re Appeal of Water Dist. No. 1 of Johnson County,* 26 Kan. App. 2d 371, 988 P.2d 267 (1999), *rev. denied* 268 Kan. 886 (1999), which was then pending before the Court of Appeals. Both cases involved similar issues.

While the City's case was pending before BOTA, the Court of Appeals decided *In re Appeal of Water Dist. No. 1 of Johnson County* on August 13, 1999. The Court of Appeals held that electricity purchased to pressurize water by Johnson County was exempt from sales tax. The court did not consider whether the Johnson County water district's electricity purchases should have been taxed at the 2.5% rate, K.S.A. 1992 Supp. 79-3603(u), but instead decided the case under the "consumed in production" exception of K.S.A. 79-3606(n). See 26 Kan. App. 2d at 373-74, 376-77.

Both parties notified BOTA of the decision in *Water Dist. No. 1.* In their respective letters, both parties changed their position before BOTA. The City changed its initial position that the 2.5% tax rate applied to its purchase of electricity and argued before BOTA and this court that the City is exempt from any tax. The Department also changed its initial position that a 4.9% rate of tax, K.S.A. 1992 Supp. 79-3603(c), applied, asked BOTA not to jump

to conclusions before the petition for review had been determined in *Water Dist. No. 1.*, and argued before BOTA and this court that the 2.5% rate applies. This court declined to grant the petition for review in *Water Dist. No. 1.*

BOTA concluded the 2.5% rate of taxation under the provisions of K.S.A. 1992 Supp. 79-3603(u) applied, found that the City's electricity purchases for the period of time in question did not qualify for partial exemption under K.S.A. 1992 Supp. 79-3606(b)(2) and, unlike the court in *Water Dist. No. 1*, concluded that the tax exemption in K.S.A. 1992 Supp. 79-3606(n) did not apply.

### *COURT OF APPEALS' DECISION*

The City appealed BOTA's order to the Court of Appeals on September 28, 2000. The Court of Appeals in an unpublished opinion, *In re Appeal of the City of Wichita,* No. 85,953, filed November 2, 2001, noted that the audit of the City of Wichita covered "roughly the same time period and essentially the same issues" as those in *Water Dist. No. 1*, in which the court concluded that Johnson County owed no tax because of an exemption under K.S.A. 79-3606(n). The City of Wichita claimed that *Water Dist. No. 1* controlled. However, the Court of Appeals noted in hindsight that *Water Dist. No. 1* "was probably wrongly decided." At the same time, the Court of Appeals reversed BOTA's decision on the basis of equal protection; that is, granting tax exemption to Johnson County and taxing the City of Wichita treats similarly situated taxpayers differently, resulting in a denial of equal protection to the City of Wichita.

The Court of Appeals commented on the extreme difficulty involved in attempting to resolve this case on the merits of the tax exemption claimed: "During a single legislative session, applicable statutes were amended three times. The parties in *Water Dist. No. 1* did not argue this point and we did not decide it." The court set forth each of the 1992 amendments to K.S.A. 79-3602, concluding that it "need not decide which 1992 amendment was effective at various times, as it is not central to our ultimate holding in the present case."

The court stated that "even when a taxpayer is taxed according to the law, that taxpayer may still suffer actionable discrimination if similarly situated taxpayers are granted more favorable treatment." While the court determined that the City did not prove it suffered any intentional discrimination, the court explained that the City had been treated significantly different from the taxpayer in *Water Dist. No. 1* and that justice required that the City be treated the same as the taxpayer in *Water Dist. No. 1*. Accordingly, the court reversed BOTA's decision and remanded the case with directions to "grant Taxpayer the same treatment ordered for the taxpayer in *Water Dist. No. 1.*"

The Fourteenth Amendment to the United States Constitution provides that states cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The Kansas Constitution provides virtually identical protection. Kan. Const. art. 11, § 1; see *Colorado Interstate Gas Co. v. Beshears*, 271 Kan. 596, 609, 24 P.3d 113 (2001). If similarly situated taxpayers receive disparate treatment, the one receiving the less favorable treatment may have been denied equal protection of the law even if the taxpayer receiving the less favorable tax is taxed according to the law. 271 Kan. at 609. However, the taxpayer seeking to establish a violation of the Equal Protection Clause must demonstrate that his or her treatment is the result of a "deliberately adopted system" which results in intentional systematic unequal treatment. 271 Kan. at 612.

While the Court of Appeals in the present case found there was no intentional discriminatory treatment, the court, citing *Allegheny Pittsburgh Coal v. Webster County*, 488 U.S. 336, 102 L. Ed. 2d 688, 109 S. Ct. 633 (1989), and *Colorado Interstate Gas Co.*, 271 Kan. 596, found that the "taxpayer may still suffer actionable discrimination if similarly situated taxpayers are granted more favorable treatment." The court further relied on K.S.A. 60-2101 and K.S.A. 60-2105. K.S.A. 60-2101 provides that the Court of Appeals "shall have jurisdiction to correct, modify, vacate or reverse any act, order or judgment of a district court to assure that any such act, order or judgment is just, legal and free of abuse." K.S.A. 60-

2105 provides that the Court of Appeals "shall render such final judgment as it deems that justice requires."

The Department points out that in *Allegheny*, equal protection grounds were warranted because there was a plethora of evidence of systematic and intentional discriminatory treatment. In *Allegheny*, the taxpayer was taxed at approximately 35 times the rate applied to owners of comparable properties. The difference in treatment continued over a period of 6 years and after the property was sold. The Supreme Court noted that this approach systematically produced dramatic differences in valuation between petitioners' recently transferred property and otherwise comparable surrounding land. Further, the court in *Allegheny* noted that the Equal Protection Clause "tolerates occasional errors of state law or mistakes in judgment when valuing property for tax purposes." 488 U.S. 341-43. For authority, the Court cited *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 353, 62 L. Ed. 1154, 38 S. Ct. 495 (1918).

The United States Supreme Court in *Sunday Lake Iron Co.* rejected the taxpayer's argument that the State's mistaken property overvaluation amounted to an equal protection violation. The Court held the following:

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property. [Citation omitted.] It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party. [Citations omitted.]" 247 U.S. at 352-53.

There is an important distinction between the situation in *Sunday Lake Iron Co.* and the present case. The taxpayer in *Sunday Lake* convinced the Court that the tax was illegal, *i.e.*, contrary to state law. The record in *Sunday Lake* disclosed facts "which render it more than probable that plaintiff in error's

mines were assessed for the year 1911 (but not before or afterwards) relatively higher than other lands within the county although the statute enjoined the same rule for all." 247 U.S. at 353. However, the Court declined to provide relief. In the present case, there is no allegation that the statute under which the City was taxed is illegal. The mistake in this case, acknowledged by the Court of Appeals, was made in *Water Dist. No. 1*. There was no showing that the tax in this case was the result of intentional action. Nor was there any showing that the tax imposed in this case was the result of a deliberately adopted system which results in intentional systematic unequal treatment of the City of Wichita. As noted, the Constitution "tolerates occasional errors of state law or mistakes in judgment when valuing property for tax purposes." *Allegheny*, 488 U.S. at 343.

Contrary to the Court of Appeals' decision, the City failed to meet its burden to establish a violation of the Equal Protection Clause. The appropriate remedy, assuming a mistake in *Water Dist. No. 1*, was to not give a similar windfall to all similarly situated parties. The error was at most a mistake in judgment or mistake in the application of the law, not an intentionally and deliberately adopted system which results in systematic unequal treatment of the City.

We conclude that the City's equal protection argument fails. The City has not demonstrated that the treatment it received under the tax laws of this state was the result of intentional systematic unequal treatment. The record fails to support a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We, therefore, reverse the decision of the Court of Appeals.

### BOTA DECISION

BOTA concluded that the City's purchases of electricity should be assessed at the tax rate of 2.5%, rather than 4.9%, based upon K.S.A. 1992 Supp. 79-3603(u). In our review of the BOTA decision and the law, we conclude that the 1992 legislature removed electricity from the definition of "tangible personal property which is consumed" in K.S.A. 1992 Supp. 79-3602(m), which made exemp-

tion under K.S.A. 1992 Supp. 79-3606(n) inapplicable. At the same time, the 1992 legislature imposed a 2.5% sales tax on the sales of electricity which was "essential or necessary to and which is used in the actual process of and immediately consumed or dissipated in . . . the production, manufacture . . . of tangible personal property." K.S.A. 1992 Supp. 79-3603(u). For this reason, and based upon our analysis of the question, we affirm BOTA's determination that a 2.5% sales tax is owed by the City for the period of time in question.

### *Standard of Review*

BOTA is considered the paramount taxing authority in Kansas. *Wirt v. Esrey*, 233 Kan. 300, 314, 662 P.2d 1238 (1983). However, if BOTA's interpretation of law is erroneous as a matter of law, appellate courts will take corrective steps. *In re Tax Appeal of Intercard, Inc.*, 270 Kan. 346, 349, 14 P.3d 1111 (2000).

"[T]ax exemption statutes, such as K.S.A. 79-3606, are to be construed in favor of imposing the tax and against allowing an exemption. [Citation omitted.] On the other hand, tax statutes will be construed favorably to the taxpayer where there is a reasonable doubt as to [their] meaning. [Citation omitted.]" *Water Dist. No. 1,* 26 Kan. App. 2d at 372-73.

K.S.A. 77-601 *et seq*. sets forth our scope of review. See K.S.A. 2001 Supp. 74-2426(c). K.S.A. 77-621(a) provides that unless "this act or another statute provides otherwise: (1) The burden of proving the invalidity of agency action is on the party asserting invalidity." In this case, BOTA ordered the City to pay a sales tax. Thus, the City bears the burden of proving BOTA's decision erroneous. K.S.A. 77-621(c) further specifies that this court may grant relief in the following cases:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

See *In re Tax Appeal of Panhandle Eastern Pipeline Co.*, 272 Kan. 1211, Syl. ¶ 1, 39 P.3d 21 (2002). Interpretation of statutes is a question of law; thus, to the extent statutory interpretation is required in this case, our review is unlimited. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

### Analysis of relevant amendments

K.S.A. 79-3602 (Ensley 1989) contained definitions of words and terms used throughout the sales tax provisions. That statute was amended three times in 1992. Each of the following three session laws contained either italicized or strike-through language in only one particular subsection. In other words, none of them, viewed in isolation, purported to amend by italicized or strike-through type more than one subsection. Further, each of the following session laws explicitly amended K.S.A. 79-3602, not K.S.A. 79-3602 as amended by either of the other two session laws enacted in 1992. Our discussion considers the session laws in the order they became effective. We also note that the order of enactment of the amendments is the reverse of the order of their effectiveness.

1. *The (m) Session Law: L. 1992, ch. 280, § 58 (approved May 20, 1992, effective June 1, 1992, and codified at K.S.A. 1992 Supp. 79-3602[m]).*

"On June 1, 1992, K.S.A. 79-3602 is hereby amended to read as follows: 79-3602.

. . . .

"(m) 'Property which is consumed' means tangible personal property which is essential or necessary to and which is used in the actual process of and immediately consumed or dissipated in (1) the production, manufacture, processing, mining, drilling, refining or compounding of tangible personal property, (2) the providing of services or (3) the irrigation of crops, for sale in the regular course of business, and which is not reusable for such purpose. The following items of tangible personal property are hereby declared to be 'consumed' but the listing of such property shall not be deemed to be exclusive nor shall such listing be construed to be

a restriction upon or an indication of, the type or types of property to be included within the definition of 'property which is consumed' as herein set forth:

"~~(A)~~ Insecticides, herbicides, germicides, pesticides, fungicides, antibiotics, biologicals, pharmaceuticals, vitamins and chemicals for use in commercial or agricultural production of fruit, vegetables, feeds, seeds, animals or animal products whether fed, injected, applied or otherwise used~~, and~~

"~~(B) electricity, gas and water.~~" L. 1992, ch. 280, sec. 58.

The (m) session law removed subsection (B). With the words "electricity, gas and water" removed from the definition of "tangible personal property which is consumed" in 79-3602, taxation of these items was no longer explicitly exempted by K.S.A. 79-3606(n) (Ensley 1989), which exempted sales of tangible personal property consumed in the production of tangible personal property:

"(n) all sales of *tangible personal property which is consumed in the production [or] manufacture, . . . of tangible personal property* . . . may obtain from the director of taxation and furnish to the supplier an exemption certificate number for tangible personal property for consumption in such production, manufacture, processing, mining, drilling, refining, compounding, irrigation and in providing such services." (Emphasis added.) K.S.A. 1991 Supp. 79-3606(n).

*2. The (j) Session Law: L. 1992, ch. 198, sec. 7 (approved April 24, 1992, effective July 1, 1992, and codified at K.S.A. 1992 Supp. 79-3602b[j]).*

The (j) session law modified K.S.A. 79-3602(j) (Ensley 1989), which defined "isolated or occasional sale." Subsection (j) is unrelated to the present case. However, as the Court of Appeals noted, the (j) session law retained K.S.A. 79-3602(m)(B) (Ensley 1989) as it stood before the (m) session law, L. 1992, ch. 280, sec. 58, became effective. It is important to note, the language in the (j) session law retaining K.S.A. 79-3602(m)(B) (Ensley 1989) language is not in italics, but is in regular type. Of further interest, the modifications to subsection (l), as explained below, are also not reflected in the (j) session law.

*3. The (l) Session Law: L. 1992, ch. 102, sec. 7 (approved April 16, 1992, effective July 1, 1992, and codified at K.S.A. 1992 Supp. 79-3602a[l]).*

The (l) session law modified K.S.A. 79-3602(l) (Ensley 1989), which defined "ingredient or component part." This modification is not relevant to the present case. However, as the Court of Appeals again noted, this session law retained subsection (m)(B) as it

stood before the (m) session law, L. 1992, ch. 280, § 58—again without italicized type. Of interest, the modification created by the (j) session law, described above, was not reflected in this session law, although the amendments to subsection (j) and (l) became effective on the same day.

*The legislature's reconstruction of K.S.A. 1992 Supp. 79-3602, K.S.A. 1992 Supp. 79-3602a, and K.S.A. 1992 Supp. 79-3602b.*

The Revisor of Statutes was faced with the same confusion at issue in this case; hence, the creation of two new sections, K.S.A. 1992 Supp. 79-3602a and 79-3602b, to accommodate the (j) and (l) session laws. Notably, none of the three session laws explicitly created new sections in the Kansas Statutes Annotated—each purported to amend 79-3602. The legislature summarily repealed what the Revisor of Statutes had codified at 79-3602a and 79-3602b with L. 1994, ch. 2, § 5, which became effective on February 17, 1994. On the same day, L. 1994, ch. 2, § 1 became effective, incorporating the amendments made by the 1992 sessions laws affecting subsections (m), (l), and (j) into one section.

The language deleted by the (m) session law in 1992 is not found in the 1994 session law merging the amendments made by the (m), (l), and (j) session laws. Thus, while not conclusive evidence of what the 1992 legislature intended, there is no question that the 1994 legislature did not believe the (m)(B) language deleted by the (m) session law survived the 1992 legislative session through re-enactment by the (j) and (l) session laws. Otherwise, the session law would have reprinted (m)(B) with strike-through type. On the other hand, as mentioned above, the legislature did delete K.S.A. 79-3602a and 79-3602b—both of which contained subsection (m)(B)—when it enacted L. 1994, ch. 2, § 5.

Prior to June 1, 1992, K.S.A. 79-3603 (Ensley 1989) imposed the following tax on electricity:

"For the privilege of engaging in the business of selling tangible personal property at retail in this state or rendering or furnishing any of the services taxable under this act, there is hereby levied and there shall be collected and paid a tax at the rate of 4.25% upon:

. . . .

"(c) the gross receipts form the sale or furnishing of gas, water, electricity, and heat, which sale is not otherwise exempt from taxation under the provisions of this act, and whether furnished by municipality or privately owned utilities."

In 1992, the legislature amended 79-3603 with the following:

"For the privilege of engaging in the business of selling tangible personal property at retail in this state or rendering or furnishing any of the services taxable under this act, there is hereby levied and there shall be collected and paid a tax at the rate of 4.25% 4.9%, *unless otherwise more specifically provided*, upon:

. . . .

"(c) the gross receipts from the sale or furnishing of gas, water, electricity and heat, which sale is not otherwise exempt from taxation under the provisions of this act, and whether furnished by municipally or privately owned utilities;

. . . .

"(u) *the gross receipts received from all sales of electricity, gas and water which is essential or necessary to and which is used in the actual process of and immediately consumed or dissipated in: (1) The production, manufacture, processing, mining, drilling, refining or compounding of tangible personal property; (2) the providing of services; or (3) the irrigation of crops, for sale in the regular course of business, and which is not reusable for such purposes which shall be taxed at the rate of 2.5%*" L. 1992, ch. 280, sec. 59.

New language is shown in italic type and deleted language is shown by strike-through type. The quotation above and the (m) session law discussed above are actually the same session law. Both became effective on June 1, 1992. K.S.A. 1992 Supp. 79-3603 was amended twice in 1994, but subsection (u) was not affected. Subsection (u) was deleted in 1995, effective April 15, 1995. L. 1995, ch. 118, sec. 3. The 1992 amendment to 79-3603 created two levels for the taxation of sales of electricity: K.S.A. 1992 Supp. 79-3603(c) and K.S.A. 1992 Supp. 79-3603(u).

Reconciliation of the session laws enacted during the audit period in this case is a question of law, and our review is unlimited. *State v. Jurdan*, 258 Kan. 848, 850, 908 P.2d 1309 (1995). The fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained, and when a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. *Robinett v. The Haskell Co.*, 270 Kan. 95, 100, 12 P.3d 411 (2000).

Further, there is a presumption that the legislature does not intend to enact useless or meaningless legislation. *Hartford Cas. Ins. Co. v. Credit Union 1 of Kansas*, 268 Kan. 121, 132, 992 P.2d 800 (1999).

The Department argues that the legislature intended each of the 1992 session laws amending K.S.A. 79-3602 (Ensley 1989) to affect only one particular subsection, and any meaning derived from the session laws regarding subsections not explicitly affected by italicized or strike-through type is misplaced. The Department relies on the explanatory language at the beginning of the session laws which informs the reader that new language is shown with italicized type and deleted language is shown with strike-through type.

The Department offers *State v. Roderick*, 259 Kan. 107, 911 P.2d 159 (1996), to support its position. *Roderick* permitted review of the State's appeal upon a question reserved following Roderick's sentence. Roderick entered "guilty pleas in three separate criminal cases for four offenses committed on different dates." 259 Kan. at 108. The issue was whether the convictions in the separate cases could be used in each of the other cases for purposes of determining Roderick's criminal history score. The district court did not consider the convictions in the other cases. The court repeated the often cited fundamental rule of statutory construction: "[T]he intent of the legislature governs when that intent can be ascertained from the statute. When a statute is plain and unambiguous, we must give effect to the intention of the legislature, rather than determine what the law should or should not be. [Citation omitted.]" 259 Kan. at 110.

For purposes of resolving the question, this court in *Roderick* turned to the definition of "prior conviction" as defined at K.S.A. 1994 Supp. 21-4710(a). 259 Kan. at 110. The definition of prior conviction was essential in determining the defendant's criminal history score. The court also cited K.S.A. 1994 Supp. 21-4710(d)(11), which further defined "conviction" in a way unfavorable to *Roderick*. 259 Kan. at 110-11.

The court then turned to *Roderick's* argument which is somewhat similar to the City's argument in the present case. Roderick pointed out that K.S.A. 1993 Supp. 21-4710 was amended twice in

1994. The first amendment, L. 1994, ch. 291, sec. 54, was approved April 25, 1994, and codified at K.S.A. 1994 Supp. 21-4710. It amended 21-4710 by forming the law discussed above, subsection (d)(11). The second amendment, L. 1994, ch. 341, sec. 15, was approved May 11, 1994, and codified at K.S.A. 1994 Supp. 21-4710a. The second amendment did not contain the amendments in the former session law: "Roderick argues those omissions from K.S.A. 1994 Supp. 21-4710a indicate that the legislature intended to eliminate the definition of 'prior conviction' from the statute." 259 Kan. at 111.

This court was not persuaded. The court noted that the two session laws represented separate bills and that they proceeded through the legislature and became law toward the end of the session "before the separate amendments were reconciled." The court noted the following rule:

"Repeal by implication is not favored, and acts will not be held to have been repealed by implication unless a later enactment is so repugnant to the provisions of the first act that both cannot be given force and effect. [Citation omitted.] Such a repeal is not to be found when both statutes may operate independently without conflict. [Citation omitted.]" 259 Kan. at 111.

The court found that K.S.A. 1994 Supp. 21-4710 and K.S.A. 1994 Supp. 21-4710a were not in conflict. "Each contains amendments to different portions of K.S.A. 1993 Supp. 21-4710. Both can be read and applied together. Therefore, the definition of 'prior conviction' and K.S.A. 1994 Supp. 21-4710(d)(11) should not be considered as repealed by implication." 259 Kan. at 111.

*Roderick* provides an analogous situation to the present case. The three 1992 session laws amending 79-3602 contain amendments to different portions of 79-3602. They can be read together and used to form a section similar to what the legislature formed in 1994. In this sense, the session laws do not conflict, just as they did not in *Roderick*. To hold otherwise, this court would have to conclude the (m) session law, L. 1992, ch. 280, sec. 58, was repealed by implication when the (j) and (l) session laws became effective. The logic behind merging the three session laws together is further bolstered by the legislature's amendments in 1994 which remove all doubt about the legislature's intent to eliminate (m)(B).

There is further support for interpreting the 1992 session laws amending 79-3602 as not presenting a conflict. Under the City's theory, the imposition of the 2.5% rate on electricity, K.S.A. 1992 Supp. 79-3603(u), which was contained in the same session law as the amendment to 79-3602(m) and, therefore, became effective at the same time, would become useless and meaningless with the repeal of the (m) session law by implication caused by the (l) and (j) session laws. No argument can be made that K.S.A. 1992 Supp. 79-3603(u) was similarly repealed by implication. Thus, under the City's theory, as of July 1, 1992, electricity was, per K.S.A. 1992 Supp. 79-3602a(m) or K.S.A. 1992 Supp. 79-3602b(m), back in the definition of "tangible personal property which is consumed," and, therefore, within the exemption provided at K.S.A. 1992 Supp. 79-3606(n). Under such an interpretation, the 2.5% rate of taxation in K.S.A. 1992 Supp. 79-3603(u) would have no function.

The City responded by citing *State, ex rel., v. McCombs*, 125 Kan. 92, 262 Pac. 579 (1928). McCombs faced a similar situation as the effective dates of two session laws were the reverse of the enactment dates. The City's brief summarizes *McCombs* with the following: "In construing these statutes, the Court held that the later effective date (although the earlier enactment) must be given paramount authority, and the later enacted provisions 'cannot stand' when the earlier enactment became effective."

In *McCombs,* the State brought an action in mandamus to compel the mayor of Kansas City to sign a contract for the purchase of coal. Two session laws were in issue: (1) L. 1907, ch. 121, which was enacted March 9, 1907, and became effective March 21, 1907, and (2) L. 1907, ch. 114, which was enacted March 2, 1907, and became effective May 27, 1907. The mayor, in part, argued that L. 1907, ch. 121, which authorized the appointment of a purchasing agent, gave the mayor and the purchasing agent the power to veto the contract. However, according to L. 1907, ch. 114, such veto power was taken away from the mayor.

The court disagreed that L. 1907, ch. 121 could be used to amend the earlier enacted statute, L. 1907, ch. 114. 125 Kan. at 94-96. The court, in part, based its reasoning on the fact that L. 1907, ch. 121 explicitly applied to the council form of government,

while L. 1907, ch. 114 applied to the commission form of government. However, the court hesitated to rest its decision on those grounds, finding that it is "always desirable" to provide the advantages to both forms of government unless specific and explicit statutory language precludes application to both forms. 125 Kan. at 95. Thus, the court concluded it would be appropriate to apply L. 1907, ch. 121 to the extent it does not conflict with L. 1907, ch. 114. 125 Kan. at 95. However, as mentioned above, the two session laws conflicted over the issue of the mayor's veto power:

"By chapter 114 the veto power is taken away from the mayor and he is given a vote as a member of the board of commissioners, and if the full use of the provisions of chapter 121 amount to a veto in effect as between the mayor and the other members of the board of commissioners, then the provisions of chapter 121 are directly in 'conflict with the provisions of this act (chapter 114)' and to that extent they cannot stand. Disregarding the statement of later and earlier acts, the following is an appropriate rule of construing statutes:

'Where a conflict exists between a later and an earlier act of the legislature, and where the later act does not attempt to cover all the provisions of the earlier act, both acts ordinarily remain in force except on the point where the acts are in conflict, in which respect the later act supersedes, repeals or modifies the inconsistent terms of the earlier enactment.' [Citation omitted.]" 125 Kan. at 96.

Thus, although similar in some respects, the court in *McCombs* was faced with a much different set of facts than we face in this case. In *McCombs*, two separate session laws conflicted in substance. In the present case, the conflict in session laws is a matter of form in that the multiple session laws which modify the same section were not reconciled before they were passed. Moreover, the principles cited in *McCombs* lend some support to the Department's position that " '[d]ifferent statutes relating to the same subject matter are to be construed together." 125 Kan. at 96 (quoting *State v. Young*, 17 Kan. 414, Syl. ¶ 2 [1877]).

The factual situation in this case is more similar to *Roderick* when compared to *McCombs*. It is a well reasoned opinion and a more recent case. As such, our analysis is aided by relying upon *Roderick* rather than on *McCombs* in resolving the issues relating to the three session laws.

We conclude that BOTA did not err in its interpretation of the 1992 legislative changes to 79-3602. The 1992 legislature removed

electricity from the definition of "tangible personal property which is consumed" in 79-3602(m), which made exemption under 79-3606(n) inapplicable. At the same time, the 1992 legislature imposed a 2.5% sales tax on the sales of electricity which was "essential or necessary to and which is used in the actual process of and immediately consumed or dissipated in . . . the production [or] manufacture . . . of tangible personal property." K.S.A. 1992 Supp. 79-3606(u). BOTA's decision is affirmed.

### *Exemption for Political Subdivision Purposes*

The City argued that BOTA erred in refusing to apply the exemption provided at K.S.A. 1992 Supp. 79-3606(b)(2). BOTA refused to apply the exemption because the purchases of electricity were not used exclusively for political subdivision purposes. BOTA determined the statute did not contemplate allocating the electricity purchased between exempt and nonexempt uses.

Statutory provisions exempting property from taxation are to be strictly but reasonably construed. *Kansas Enterprises, Inc. v. Frantz*, 269 Kan. 436, 442, 6 P.3d 857 (2000). *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 751, 973 P.2d 176 (1999), devised five rules regarding exemptions which require an exclusive use:

"(1) Taxation is the rule; exemption is the exception. All doubts are to be resolved against exemption and in favor of taxation.

"(2) Constitutional and statutory provisions exempting property from taxation are to be strictly construed. [Citations omitted.]

"(3) The burden of establishing exemption from taxation is on the one claiming it. [Citation omitted.]

"(4) The question is not whether or not the property is used partly or even largely for the purpose stated in the exemption provisions, but whether it is used exclusively for those [purposes]. [Citations omitted.]

"(5) The phrase "used exclusively" in the constitution and statutes means that the use made of the property sought to be exempted from taxation must be only, solely, and purely for the purposes stated, and without participation in any other use. [Citation omitted.]"

K.S.A. 1992 Supp. 79-3606(b)(2), provides, in relevant part:

"The following shall be exempt from the tax imposed by this act:

. . . .

"(b) all sales of tangible personal property . . . purchased directly by the state of Kansas [or] a political subdivision thereof . . . *and used exclusively for state [or] political subdivision . . . purposes,* except when . . . (2) such political subdivision is engaged or proposes to engage in the business of furnishing gas, water, electricity or heat to others and such items of personal property or service are used or proposed to be used in such business." (Emphasis added.)

The question BOTA faced was whether the exclusive use phrase was satisfied when the City was engaged in the business of furnishing water to others.

The City argues that if providing water fails to meet the definition of political subdivision purposes, there would be no need for the exception. It contends that if furnishing water did not amount to a political subdivision purpose, the exemption would not apply in the first instance; therefore, the legislature must have considered furnishing water a political subdivision purpose. Under this interpretation, the purchases of electricity were exclusively for political subdivision purposes whether the water was furnished for the City or for sale to others.

However, consistent with our standard of review, we interpret the phrase "political subdivision purpose" narrowly, which is appropriate under the doctrine of operative construction. Thus, if the City was in the business of furnishing water, any purchases used for that purpose cannot qualify for the exemption.

The Department argues that 79-3606(b) requires exclusive use for an exempted purpose, and because furnishing water was excepted from the exemption, the exemption would not apply.

We consider the language of the "except when" clause as making the entire subsection inapplicable when the political subdivision was in the business of furnishing water to others. The exception is phrased as "except when" not "except to the extent." When the exception is in effect, "all sales of tangible personal property or service" are not exempt.

The parties cite administrative regulations which directly and indirectly affect the interpretation of 79-3606. The Secretary of Revenue (Secretary) is directed by statute to adopt rules and regulations for the administration of the taxing statutes. See K.S.A. 2001 Supp. 79-3618(a). The standard of review with respect to

interpreting statutes enforced by executive agencies is slightly tempered:

"While construction or interpretation of statutory language is a judicial function, interpretation of a statute is a necessary and inherent function of an agency in its administration or application of that statute. [Citation omitted.] Usually, the legal interpretation of a statute by an administrative agency that is charged by the legislature with the authority to enforce the statute is entitled to great judicial deference although when reviewing questions of law, the court may substitute its judgment for that of the agency. [Citation omitted.] However, such interpretation is only entitled to deference if it has a rational basis. [Citation omitted.]" *Mitchell v. Liberty Mut. Ins. Co.,* 271 Kan. 684, 699-700, 24 P.3d 711 (2001).

The regulation corresponding to the 79-3606(b) exemption is found at K.A.R. 92-19-76:

"(d) The exemption from sales tax for political subdivisions applies only to the extent the political subdivision is not engaged nor proposes to engage in the business of furnishing gas, water, electricity or heat to others and the tangible personal property or taxable services are used or proposed to be used in such business. *When a political subdivision is engaged or proposes to engage in furnishing any of these four businesses, the political subdivision shall pay sales tax on all purchases of tangible personal property and taxable services used in these businesses.* Nothing under this section of the act shall be construed to limit other exemptions which may be available to a political subdivision which furnishes gas, water, electricity or heat." (Emphasis added.)

While the "to the extent" language might suggest it is appropriate to prorate the purchases of electricity, the second sentence strongly suggests that "all" purchases made in the furnishing of water should be taxable.

The Department also cites its informational guide, which is not binding upon this court:

"The law does not allow cities to prorate the amount of sales tax to be paid the retailer when an item or service is to be used only part time in the business of selling gas, water, electricity or heat to others. For example, if a city purchases a pick-up truck which will be used half-time by the city's water department (taxable) and half-time by the city's streets and roads department (nontaxable), the sales tax law does not provide such city with authority to prorate the sales tax and pay the dealer sales tax on half of the cost of the pick-up. Thus, the rule is—if the item is to be used at all in the business of selling gas, water, electricity or heat to others then, sales tax is due on the total selling price." Kansas Department of Revenue, "Kansas Retailers' Sales Tax & Kansas Compensating (USE) Tax," Information Guide 19-93-1 (March 1, 1993).

The City points out that at least three other regulation sections contemplate prorating electricity between exempted uses and non-exempted uses. K.A.R. 92-19-20(c) provides that when claiming an exemption, the following shall apply:

"(1) When gas, electricity, or water is furnished through one meter for both taxable and exempt purposes, the taxpayer shall have the burden of establishing the exempt portion or percentage of the gas, water or electricity.

"(2) The purchaser shall furnish the supplier a statement to enable the supplier to determine the percentage of the gas, water and electricity subject to exemption under K.S.A. 79-3606(f) and (n). The formula and computations used in determining the exemption shall be available for inspection any time by the department of revenue."

However, K.S.A. 1992 Supp. 79-3606(f) and (n) did not contain an exclusive use requirement.

K.A.R. 92-19-37 provides as follows:

"(a) Where sales of natural gas, electricity, heat and water delivered through mains, lines or pipes are made to multi-family dwellings or other buildings in which residential premises are not individually metered and billed, only the pro rata portion of these sales equal to the percentage of the building actually occupied as residential premises shall be subject to exemption. As used in this regulation, 'residential premises' shall have the meaning ascribed to it in K.A.R. 92-19-38."

Again, the exemption in the above regulation, relying on K.S.A. 1992 Supp. 79-3606(w) for support, does not have an exclusive use requirement.

The City also cites K.A.R. 92-19-39, which was revoked in 1998:

"(a) Sales of natural gas, electricity, heat and water delivered through mains, lines or pipes for agricultural use are exempt from sales tax. Where utility services are not metered individually between agricultural and commercial uses, the burden of establishing the percentage of exempt usage is on the consumer, and the formula and computations used in establishing the percentage of exempt use shall be available for inspection at any time by the department of revenue."

The above exemption, relying on K.S.A. 1992 Supp. 79-3606(w) for support, does not require an exclusive use.

Given the narrow interpretation of exemption statutes, combined with the deference to administrative interpretation appropriate under the doctrine of operative construction, we conclude that the City's purchases of electricity are not to be prorated be-

cause they were also for purposes which are expressly nonexempt under law. BOTA was, therefore, correct in not prorating the purchases and in its affirming the assessment of tax on all City purchases.

### *Interest*

BOTA found that the City was not entitled to an abatement of interest on the assessment of additional sales tax:

"59. Finally, the Board finds that the Taxpayer is not entitled to the abatement of interest and penalties on the assessment of additional sales tax. . . . For the Taxpayer to be entitled to the abatement of interest, the delay in assessing the tax must have resulted from the negligence of a Department employee. . . . In this case, the delay in completing the assessment was caused by the unexpected medical retirement of the first auditor. Once a second auditor was assigned, the audit was completed in a timely manner. The Board finds no negligence on the part of any employee of the Department that contributed to the delay in completing the assessment. The Board finds that the Taxpayer's request for an abatement of interest should be denied."

Our standard of review requires that we determine if BOTA's decision is supported by substantial evidence, reviewing the record as a whole. K.S.A. 77-621(a)(7). Since BOTA made a negative finding that there was no negligence, the finding will not be disturbed on appeal absent an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 441, 885 P.2d 1233 (1994).

K.S.A. 79-3268(d) provides:

"The director shall waive any interest assessed against a taxpayer when it is determined by the director that the negligence of an employee of the department resulted in undue delay in either assessing tax or notifying the taxpayer of the liability owed."

The section was amended in 1997, L. 1997, ch. 126, sec. 16, but the amendment did not affect subsection (d).

Before the Court of Appeals, the City argued that the audit began in September 1994 and was not complete until February 1996. However, the delay from the time Smith began his work on the audit until the time Blaha began her work on the audit affected

the audit period itself. Thus, any delay gave the City the benefit of excluding 9 months, *i.e.*, 3 years before Smith began his audit (September 1991) until 3 years before Blaha began her audit (June 1, 1992), from the audit period. Regarding the time Blaha took to complete the audit, the City's attorney at the hearing before the ALJ remarked that the time was not unreasonable. The record supports BOTA's determination and there is no evidence which would support reversal of the negative finding that the Department's employees were not negligent in either assessing the tax or in notifying the taxpayer.

The City complained about the "inordinate time required to move this case through the administrative process." The Department pointed out that the statutory language only contemplated delay in assessing the tax or notifying the taxpayer of the liability. The City fails to persuasively respond to the Department's argument that delays other than in assessing tax and notification of the taxpayer are beyond the reach of K.S.A. 79-3268(d). "Ordinary words are to be given their ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. [Citation omitted.]" *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001). Without any statutory authority for extending K.S.A. 79-3268(d) to delays other than those plainly specified in that subsection, we decline to expand that subsection.

BOTA did not err in failing to find that the Department's employees were negligent, and BOTA's decision refusing to waive interest on the assessed tax is affirmed.

### Attorney Fees

The City in this case sought attorney fees and costs pursuant to K.S.A. 79-3268(f). K.S.A. 79-3268(f) provides:

"Attorney fees and related expenses may be awarded to a taxpayer if it can be proved that an assessment or claim asserted by the department is without a reasonable basis in law or fact. A taxpayer must first exhaust its administrative remedies before an award of attorney fees may be made under this section."

The Court of Appeals, in this case, determined the City was not entitled to attorney fees and costs because, citing K.S.A. 79-3268(f), it could not determine that the Department "made its assessment without a reasonable basis in law and fact." Unlike the Court of Appeals, we affirm the BOTA decision. Thus, in light of our conclusion, we find that attorney fees are even less appropriate in this case and affirm the Court of Appeals' denial of attorney fees and costs.

The Court of Appeals' decision is affirmed in part and reversed in part, and the decision of BOTA is affirmed.

LARSON, S.J., assigned.